**PRINGLE QUINN ANZANO, P.C.**
701 Seventh Avenue
P.O. Box 420
Belmar, New Jersey 07719
732-280-2400
Kenneth E.  Pringle (KEP-8502)
Attorneys for Plaintiffs Stop & Shop Companies, Inc., *et al.*

**RECEIVED**

JUL 1 1 2005

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CIVIL ACTION NO.:

05-3469 (SRC)

| | |
|---|---|
| STOP & SHOP COMPANIES, INC.; OCEAN 35 ACQUISITIONS, LLC; AND CERUZZI HOLDINGS, LLC,<br><br>          Plaintiffs,<br><br>          v.<br><br>TOWNSHIP OF OCEAN, a municipal corporation; MAYOR & COUNCIL OF THE TOWNSHIP OF OCEAN; AND THE OCEAN TOWNSHIP PLANNING BOARD,<br><br>          Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Introduction

1.     This is a challenge to Ocean Township Ordinance No. 2013 (hereinafter the "Ordinance"), which was finally adopted by the Defendant Mayor & Council of the Township of Ocean, Monmouth County, New Jersey, on May 25, 2005.  The Ordinance changed the zoning of a single, 31-acre parcel of land known as Block 33, Lot 19.01 on the Ocean Township Tax Map (hereinafter the "Property").  For nearly two years Plaintiffs have been proceeding on a land use application before the Defendant Ocean

1

Township Planning Board to develop the Property as a shopping center to be occupied by a Stop and Shop grocery store and other retail and restaurant uses (hereinafter "the Site Plan Application").

2.     The Ordinance, which became effective on the last day before Plaintiffs were scheduled to put on their final witnesses and rest their application, changed the zoning of the property and effectively bars plaintiffs from utilizing the site for a Stop & Shop store of a size that would be competitive with other grocery stores on Route 35. In addition, the Ordinance prohibits Plaintiffs from developing the Property whatsoever unless they develop the Property in its entirety; unless they dedicate without compensation more than two acres of prime highway intersection land for jughandle and bypass improvements; unless they construct more than $1 million in highway jughandle and bypass improvements at their own cost and expense; unless they dedicate land and construct a road across their property and provide vehicular and pedestrian access to the public at large to a municipal library located on an adjacent site; and unless they dedicate land without compensation and construct plazas, seating areas and other public areas throughout the Property at their own cost and expense and make those areas and improvements open and available to the public.   Plaintiffs challenge the constitutionality of the Ordinance as an unconstitutional inverse condemnation of Plaintiffs' valuable property rights and as a taking without just compensation in violation of the United States and New Jersey Constitutions, and on the ground that the Ordinance violates the rights of Plaintiff Stop & Shop Companies pursuant to the Commerce Clause of Article I of the United States Constitution. Plaintiffs also challenge the Ordinance on the grounds that it constitutes reverse spot

2

zoning and is otherwise an arbitrary, capricious and unlawful exercise of the
Defendants' powers pursuant to New Jersey's Municipal Land Use Law, N.J.S.A.
40:55D-1, et seq. The Plaintiffs also seek injunctive relief barring the Defendants from
unreasonably delaying Plaintiffs' Site Plan Application in the future, and declaratory
relief establishing Plaintiffs rights to be free from arbitrary and selective enforcement of
Ocean Township's regulations governing the width of parking stalls.

**The Parties**

3.     Plaintiff Ocean 35 Acquisitions, LLC (hereinafter "Ocean 35 Acquisition")
is a Delaware Limited Liability Company, which was formed on or about March 15, 2001
for the purpose of acquiring the Property, which is located at the northeast corner of the
intersection of Highway 35 and Deal Road in the Township of Ocean. The Property is
comprised of what were previously designated on the Ocean Tax Map for Block 33 as
Lots 17, 18, 19 and a small portion of Lot 16.

4.     Plaintiff Stop & Shop Companies, Inc. (hereinafter "Stop & Shop"), which
has its principal place of business at 1385 Hancock Street, Quincy, Massachusetts, is a
Delaware corporation that is in the business of selling groceries and other consumer
products through an interstate chain of more than 345 retail food stores that operate
under the Stop & Shop, Super Stop & Shop, Edwards and PeaPod tradenames
throughout New England, New York and New Jersey.

5.     Ceruzzi Holdings, LLC ("Ceruzzi") is a Delaware Limited Liability
Company, with its principal place of business at 1720 Post Road, Fairfield, Connecticut.
Ceruzzi is in the business of developing commercial shopping centers. Plaintiff Ceruzzi
is the applicant on the Site Plan Application, and if granted, would develop the Property

3

in accordance therewith.

6.     Defendant Township of Ocean (hereinafter "Ocean Township") is a municipal corporation and a political subdivision of the state of New Jersey.

7.     Defendant Mayor & Council of Ocean Township (hereinafter "the Mayor & Council") is the duly elected governing body of defendant Ocean Township.

8.     Defendant Planning Board of Ocean Township (hereinafter "the Planning Board") is the duly appointed Planning Board of defendant Ocean Township.

9.     At all times relevant to this litigation, the defendants Township of Ocean, Mayor and Council and Planning Board were persons within the meaning of 42 U.S.C. § 1983 and were acting under color of state of law.

### Jurisdiction and Venue

10.     This is a suit for injunctive and declaratory relief and for monetary damages. The causes of action for injunctive relief and monetary damages are provided by 42 U.S.C. § 1983, which permits a suit at equity and at law against any person who, under color of state law, causes injury to another in violation of the Constitution of the United States. The cause of action for declaratory relief arises under 28 U.S.C. § 2201, which permits a court to declare the rights of any interested party in a case of actual controversy.

11.     This suit presents federal questions that arise under the Fifth and Fourteenth Amendments and the Commerce Clause of Article I of the Constitution of the United States, and 42 U.S.C § 1983. This suit also presents state law claims that arise under the Constitution of the State of New Jersey, and the New Jersey Municipal Land Use Law, N.J.S.A. 40:55D-1, *et seq*. Jurisdiction for Plaintiffs' federal claims is

4

provided by 28 U.S.C. § 1331. This Court has pendent jurisdiction over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in this Court under 28 U.S.C. § 1391, as all defendants may be found in this District.

## Background and the Prior Zoning of the Property

12.     Until early 2001, the Property was zoned O-1/80 Office-Research-Limited Commercial Zone, which permitted the development of the bulk of the Property for office park use. But the Property, together with an additional 19-acre parcel to the east which was zoned R-1T, was also overlaid by the Commercial Development Overlay ("CDO") Zone.

13.     The CDO Zone was added in January, 2001 because the Mayor & Council were concerned that if the Property was developed for office use in accordance with the O-1/80 zoning traffic on local roads would be seriously degraded, particularly at rush hour. The Mayor & Council adopted the CDO Overlay Ordinance on the basis of the November 30, 2000 Master Plan Reexamination Report, which was prepared by Township Planner James W. Higgins. As set forth in that report, which was adopted by the Planning Board and which resulted in the amendment of the Township's Master Plan, the CDO Overlay zoning was envisioned to encourage the construction of jughandle and bypass improvements at the intersection of Highway 35 and Deal Road at no cost to Ocean Township, and to mitigate the increases in rush hour traffic on Deal Road and other local roads that would occur if the Property were developed pursuant to the underlying O-1/80 zoning.

14.     The CDO zoning permitted the development of the Property with all uses

5

permitted in the C2 Zone, which included food stores and shopping centers, and which was the same zoning that was applicable to most of the Highway 35 corridor through Ocean Township, including the sections immediately to the north, and cater-corner to the Property across Highway 35. Indeed, Ordinance No. 1880, the zoning amendment that was adopted on January 10, 2001 to establish the CDO zone stated that "[i]t is the purpose of the Commercial Development Option to enhance the potential for commercial development on the eastern side of Route 35 at Deal Rd., consistent with other land uses within the Route 35 Corridor and the "Route 35/Deal Rd. Center" as defined on Map 5-Community Characteristics – of the Township Master Plan."

15.     When Plaintiff Ocean 35 Acquisition purchased the Property in May of 2001, it did so in reliance upon the CDO Overlay zoning, which permitted food stores and shopping centers.

16.     Both the 0-1/80 Zoning and the CDO Zoning permitted the same density of development (27% lot coverage and FAR of .30), but the 0-1/80 Zoning permitted lots to be developed incrementally in parcels as small as two acres each. The CDO Zoning required a minimum of 20 acres to be developed. In addition, the CDO Zoning imposed numerous requirements as a condition of the developing the property pursuant to the CDO Zoning. These included "[a]dequate traffic circulation improvements . . . intended to relieve existing and future congestion at the intersection of Deal Rd. and N.J. Route 35." To that end, the CDO Zoning specifically required a developer seeking to develop the property for C2 uses to make the following off-tract highway and road improvements:

A.     To construct a "far side jughandle" at the northeast corner of the

6

intersection of Deal Road and Route 35 to accommodate northbound traffic on Route 35 which intends to travel west on Deal Road. The stated purpose of this improvement according to the CDO Zone Ordinance was to "eliminate the need for left hand turns onto Deal Rd. from the existing 'jughandle' on the south side of Deal Rd."

B.      To construct a bypass lane from Deal Rd. westbound to Route 35 northbound, which would allow traffic traveling west on Deal Rd. to access Route 35 northbound without traveling through the signalized intersection.

C.      Provide access to the site from both Route 35 and Deal Road, and in particular provide access from Route 35 in the northern half of the Route 35 frontage of the site, and access to and from Deal Road at a point opposite the intersection of Logan Road with Deal Road, in order to utilize the existing traffic signal at that intersection.

These requirements effectively required the developer to dedicate as a condition of

utilizing the CDO Zoning more than 2 acres of land needed to make these public

improvements. In addition to these road and highway improvements, and the

concurrent land dedication, the CDO Zoning also required the developer to move "the

existing historic structure, known as the 'Henderson House' . . . at the developer's

expense, to a site which shall be selected by the Governing Body of the Township."

### The Township's Prior Approvals of Food Store
### Development Applications and Their
### Competitive Relationship with the Stop & Shop Companies

17.     The Property is located cater-corner from a Foodtown food store, which

upon information and belief is owned and operated by Food Circus Super Markets, Inc.,

a New Jersey Corporation, which is a member of the Foodtown grocery cooperative,

and which does business under the Foodtown and Super Foodtown tradenames. Upon

information and belief, Food Circus Super Markets, Inc. is owned in whole or in part by

Joseph Azzolina, who is a prominent resident of Monmouth County, and a long-time

7

member of the New Jersey General Assembly. (The Foodtown store owned by Food Circus Super Markets, Inc. and located at the southwest corner of Highway 35 and Deal Road, and cater-corner from the Property, is hereinafter referred to as the "Azzolina Foodtown").

18.    The owner the shopping center where the Azzolina Foodtown is located had received site plan approval on November 22, 1993 (the "1993 Azzolina Foodtown Site Plan") permitting the construction of a 4,200-square-foot bank on a pad at the northeast location of the site in the parking lot, and additions for 4,000 and 13,900 square feet in area to the Azzolina Foodtown space in the shopping center. No construction was undertaken pursuant to the 1993 Azzolina Foodtown Site Plan. On June 1, 2001, an amended site plan application was filed, seeking to eliminate from the 1993 Azzolina Foodtown Site Plan, the proposed 4,200 square foot bank use, and the 4,000-square-foot addition originally planned for the southerly portion of the Azzolina Foodtown. Instead, the entire 22,100 additional square feet of new area construction originally approved pursuant to the 1993 Azzolina Foodtown Site Plan was added to the rear of the Azzolina Foodtown for loading, storage, food preparation and additional retail space. Although the shopping center where the Azzolina Foodtown is located was nearly 300 parking spaces deficient, no variances were deemed to be necessary because the parking requirement was said to be the same, and the Planning Board approved the amendment to the 1993 Azzolina Foodtown Site Plan without hearing testimony, or without using the opportunity afforded by the request for site plan amendment to require landscaping or other buffering between the rear of the Azzolina Foodtown and an immediately apartment complex.

19.     The application to amend the 1993 Azzolina Foodtown Site Plan and to permit the expansion of the Azzolina Foodtown by 22,100 square feet was made shortly after the Property was acquired by Ocean 35 Acquisition in May of 2001, and in response thereto and/or to the adoption of the CDO Overlay Ordinance, which would permit the development of the Property for use by a food store.  Upon further information and belief, Joseph Azzolina and Food Circus Super Markets, Inc. pursued approvals for the expansion at this time so that they would be in position to expand their store and better compete with a such a store were it to be proposed to be built on the Property.

20.     On August 21, 2002, Sunset Arcadia Center, Inc. filed a site plan application to build a 118,000 square foot Wegman's store on the west side of Highway 35, between Valley Road and Sunset Avenue, less than a mile south of the Property. Notwithstanding the size of the proposed store, this application was approved by the Planning Board by resolution dated January 27, 2003 after only a single evening of testimony, and without any expert testimony regarding the traffic impact that might result from this store.  (The January 27, 2003 Resolution is referred to as the "Wegman's Site Plan Resolution").  Indeed, even though the applicant had ample 10-foot wide parking spaces, the Planning Board granted applicant a design waiver to permit the installation of 9-foot wide parking spaces.   The Planning Board noted in the Wegman's Site Plan Resolution that the "Board has routinely granted variances for parking spaces in return for larger landscaped areas."  Nevertheless, the landscaping required of Wegman's was considerably less than that required by either CDO Overlay Ordinance or the Ordinance, and did not require the construction of any kind of berm or

9

otherwise require that parked vehicles be screened from Highway 35.

21.     Stop and Shop competes head-to-head in the grocery business with Food Circus Super Markets, Inc. elsewhere in Monmouth County and in Ocean County and with other members of the Foodtown cooperative throughout New Jersey.

22.     The Property is a very advantageous location from which Stop & Shop would be able to compete with the Azzolina Foodtown because the Property would be easier to access from the area east and south of the Highway 35 and Deal Road intersection.  In addition, no food stores of a comparable size are located to the east of this intersection, which means that food store customers traveling westerly on Deal Road or northerly on Logan Road would have to pass the Stop & Shop store en route to the Azzolina Foodtown.

23.     In anticipation of the opening of the Wegman's store and the Plaintiffs' Site Plan Application and stated intention to open a Super Stop & Shop on the Property, Food Circus Super Markets, Inc. began renovating and expanding the Azzolina Foodtown in accordance with the amendment to the 1993 Azzolina Foodtown Site Plan.  These renovations were completed in late 2004, after which the Azzolina Foodtown was reopened as a "Super Foodtown."

### Plaintiffs' Efforts to Develop the Property
### for Use as a Shopping Center and
### as a Stop & Shop Store

24.     Plaintiff Stop & Shop entered into negotiations for the purchase of the property in reliance upon the then current zoning applicable to the property, which permitted the Property, subject to conditions, to be developed for use as a Stop & Shop food store, and otherwise to be developed as a retail shopping center in accordance

10

with the provisions of the CDO Ordinance.

25.     On or about March 5, 2003, Plaintiff Ceruzzi filed with the secretary of the Defendant Planning Board the application for Preliminary Major Site Plan Approval with variances, in which Ceruzzi proposed to develop the property with 189,326 square feet of retail space, approximately 13,000 square feet of restaurant space and 1,013 parking spaces.     The site plan submitted depicted a roughly U-shaped building, with the western side of the U facing Highway 35, the southern side of the U facing Deal Road and the eastern side of the U facing property owned by defendant Ocean Township. The site plan identified plaintiff Stop & Shop as the anchor tenant, and that it would occupy approximately 90,000 square feet of retail space on the eastern side of the U.

26.     The Planning Board's Planner and Engineer, William Fitzgerald, P.E., reviewed the application and proposed site plan and issued reports that were generally favorable. Indeed, the Engineer advised the Planning Board by letter dated July 28, 2003 that the "overall site layout appears desirable as to both its presentation of onsite improvements and its relationship to adjacent and nearby roadways," while noting a number of specific changes that he recommended be incorporated into the plan. The Planning Board's Planner, James W. Higgins, similarly noted in his July 24, 2003 letter report to the Board that "[g]enerally, the plan is well done," and noted a number of specific recommendations for changes. The Planning Board's original traffic expert, Henry Ney, P.E., also opined favorably on the Plaintiffs' Site Plan Application in his June 13, 2003 review letter noting that the traffic "**improvements resulting from the proposed mitigation are significant**." (Bold-faced emphasis in the original).

27.     The Site Plan Application initially garnered little attention. The first public hearing on the application, which was held at a regular meeting of the Ocean Township Planning Board on July 28, 2003, was sparsely attended and proceeded with no apparent opposition.  The initial hearing ended after approximately 45 minutes of testimony, and was carried to a special meeting before the Planning Board on September 8, 2003.

28.     Shortly after the July 28, 2003 hearing, an attorney who is known to regularly represent Joseph Azzolina requested from the office of the Planning Board Secretary copies of the entire file relating to Plaintiffs' Site Plan Application.

29.     During the intervening weeks between the initial hearing and the special meeting schedule for September 8, 2003, flyers were handed out in the Township in opposition to the project. Copies of these flyers were hung in the window of the Azzolina Foodtown.  The flyers falsely claimed that the proposed shopping center would provide only one entrance – at the light at Deal Road and Logan Road, and that there would be "**No** entrance or exit from Hwy 35." (Emphasis in original). The flyers included a purported drawing of the Plaintiffs' proposed development which drawing also falsely depicted that there would no entrance or exit from Highway 35.   The text of the flyers referenced the "huge Stop and Shop supermarket" and advised that "concerned citizens have hired an Attorney to block this proposal."  The flyers urged residents to attend the Planning Board hearing scheduled for September 8, 2003.

30.     Upon information and belief, the attorney hired by the concerned citizens as referenced in the flyer was in fact hired by the owners of the Azzolina Foodtown on behalf the concerned citizens.  Upon further information and belief, the flyers and

12

attached map were prepared and paid for by the owners of the Azzolina Foodtown.

31.     A large number of people attended the September 8, 2003 hearing.
Because the audience exceeded the capacity of the room, the Chairman of the
Planning Board cancelled the meeting.

32.     Three nights later, more than 50 residents attended the regular meeting of
the Mayor & Council. During the public comment portion of this meeting, numerous
residents spoke out against the project, raising issues such as overdevelopment, traffic
congestion and excessive light, and urged the governing body to either condemn the
property or rezone it. Several residents were specifically opposed to the proposed food
store use. For example, resident Mark Comer stated that "They are trying to make it
look nice, but a third supermarket is idiotic and the main entrance is off of Logan Road."
Another resident, Marisa Sax, said that it is "foolish to have this because there is
already a supermarket . . . [i]t will impact the businesses here and put out the
supermarkets that have been here. It is not right." In response to her question whether
there is enough business, Mayor Larkin responded: "We wondered that too, but they
did their studies." Resident Carole Konopka said that she has never seen an upscale
shopping center with a supermarket.

33.     One resident asked if this could "go to referendum so we can vote to have
more land and park." Mayor Larkin responded that the deadline to hold a referendum
was back in August. In response to a question request from another resident as to
whether the Township could reach out to Plaintiffs to see if they would sell the Property.
Mayor Larkin agreed at the September 11, 2003 meeting that he would inquire whether
the Plaintiffs would sell the property to the Township.

13

34.     Copies of new flyers were handed out to those in attendance at the September 11, 2003 meeting, advising that the hearing on the Site Plan Application had been rescheduled for October 14, 2003, in the Ocean Township High School Auditorium and urging people to attend this hearing. The flyer stated "WE NEED TO STOP THE MEETING AGAIN!" The flyer urged people to "bring more friends and neighbors. We need to overflow the High School."

35.     The October 14, 2003 hearing date was subsequently postponed. According to Planning Board secretary, the next available hearing date at which the Board's professionals, a quorum of the Board and the High School Auditorium would be available was January 28, 2004.

36.     The Defendants used the long intervals between hearings to undermine Plaintiffs' application, and upon information and belief, sought intentionally to delay Plaintiffs' application in order to lay the ground work to block it. For example, the January 27, 2004 hearing was postponed because the Defendants claimed that the Planning Board's traffic engineer – who had rendered an opinion of the likely traffic impact of the proposed development that was highly favorable to Plaintiffs – had a conflict of interest because of prior work the firm had done for Stop & Shop.

37.     Following the recusal of Henry Ney, the Defendant Planning Board retained S. Maurice Rached, P.E., P.T.O.E. of Maser Consulting, P.A. to conduct a new detailed review of the traffic impact that would likely result from the proposed Ocean Gate Commons project. After conducting an independent field investigation, and creating simulation models of traffic conditions in both the existing and proposed "as built" conditions (which included the jughandle and bypass lanes required by the CDO

14

Overlay Ordinance), Mr. Rached reported to the Planning Board by letter dated May 6, 2004, that he concurred with the comments made by the Planning Board's prior traffic engineer.

38.    Hearings on Plaintiffs' Site Plan Application finally resumed on May 10, 2004, in the Ocean Township Highway School Auditorium.  Approximately 700 people attended the hearing.  The Plaintiffs presented the testimony of their architect to provide direct testimony regarding the proposed building facades.  His direct testimony took less than an hour.  Members of the public asked questions during cross-examination for nearly three hours.  Upon information and belief, certain members of the Concerned Citizens who had organized in opposition to the application were intentionally seeking to delay and prolong the proceedings, so that the Defendants would have time to take steps to undermine or defeat the Plaintiffs' application.

39.    The next hearing on Plaintiffs' Application was held on June 30, 2004 in the Ocean Township High School Auditorium.  Plaintiffs presented the testimony of their traffic expert Daniel Disario, P.E., who testified at length regarding the very positive impact that the road improvements proposed by Plaintiffs would have in relieving existing traffic congestion on Deal Road and at the Highway 35 and Deal Road intersection, even after taking account of the additional traffic that would be generated by Plaintiffs' proposed development.  The Planning Board's traffic expert, Maurice Rached, P.E., concurred with Mr. Disario's testimony regarding the beneficial effect that the road improvements proposed by Plaintiffs would have on traffic conditions on Deal Road and at the intersection of Deal Road and Highway 35.

40.    Mr. Disario presented for the Planning Board and the public the

15

computerized traffic simulation model that had been prepared by the Planning Board's second traffic expert, Maser Consulting, P.A. The simulation model enabled the traffic flow and movement based on existing conditions to be compared with the traffic flow and movement projected on the basis of Plaintiffs' proposed development, including Plaintiffs' proposed road improvements. The Planning Board traffic expert's simulation model clearly demonstrated that Plaintiffs' proposed development would improve the flow of traffic at the Deal Road and Highway 35 intersection and reduce the back-ups on Deal Road at peak hour conditions, even after the additional traffic to be generated by the proposed development is taken into account. Mr. Disario's testimony on direct examination took most of the evening, and objectors had an opportunity to cross-examine for approximately one hour that evening before the meeting was adjourned due to the late hour.

41.     Notwithstanding that Mr. Disario's cross-examination had been continued, and that classes were out of session for Ocean Township High School for the remainder of the summer and the Planning Board Secretary did not schedule another hearing for the Plaintiffs' application until November 30, 2004, a full five months later.

42.     Upon information and belief, this delay in the Plaintiffs' application was designed to enable the Defendant Mayor & Council to proceed with two-pronged course of action that were part of their plans to derail Plaintiffs' proposed development: First, the Defendant Mayor & Council sought to raise funds through the State and from other sources to fund the condemnation of Plaintiffs' property in an effort to block its development. Second, as a back-up plan in the event their efforts to condemn the Property were unsuccessful, the Defendants retained an outside Planner, Kasler &

16

Associates, to advise the Township on how it could change the zoning of the Property.

43.    These efforts began almost immediately after the Plaintiffs presented their
expert traffic testimony, which debunked claims that Plaintiffs' proposed development of
the Property would worsen traffic in the area.  Councilman Christopher Siciliano held a
meeting on July 8, 2004 with two state legislators to explore other possible options
Ocean Township could pursue to prevent the Plaintiffs from proceeding with their
development application, and to lobby them for their support in obtaining State funds to
help fund the condemnation effort.

44.    The legislators who participated in these meetings are colleagues in the
legislature with Joseph Azzolina, one of the principals of Food Circus Super Markets,
Inc., and they are all members of the same party.

45.    In July 2004, the Mayor & Council approved placing a question on the
ballot at the November 2, 2004 election that would ask voters to approve a tax of up to
4 cents per $100 of assessed property valuation to support a $13 million bond to
acquire land and preserve it as open space.  These funds were for the purpose of
acquiring the Property by condemnation.

46.    The second prong of the Mayor & Council's effort to derail Plaintiffs' Site
Plan Application was to attempt to establish grounds to change the zoning in case the
referendum did not pass or their efforts to condemn the Property failed.  In furtherance
of that strategy, the Mayor & Council retained the planning firm of Kasler Associates,
P.A. (hereinafter "Kassler") to conduct a study of the Property and to report back to the
Mayor & Council with its recommendations on how the Property could be rezoned.

47.    In a report dated October 15, 2004, and entitled "Planning Report In the

17

Matter of a Rezoning Request for Block 33 – Lot 19.01, Ocean Township, New Jersey,"

Kasler reported back to the Mayor & Council with the following conclusion:

> This report reexamined an area of Ocean Township which occupies 30+ acres of land at the intersection of Route 35 and Deal Road. This report chronicles the surrounding land use, the existing zoning and environmental constraints of the site. The site's location at this prominent intersection makes development of this property an opportunity which requires a detailed analysis. This report examines a multitude of different land uses [sic] alternatives from Resident, Industrial, Commercial, and Office uses. Ultimately, the recommendation of this report is a mixture of uses on the subject site. The report recommends a Planned Commercial Development (PCD) or Planned Unit Development (PUD) for the subject property. These are options permitted by the Municipal Land Use Law as a zoning mechanism which can be implemented as an overlay zone or as a zoning classification. The details of a proposed PUD/PCD zoning ordinance were not a part of this study and should be accomplished along with a modification to the municipal master plan. [Emphasis supplied].

48. Notwithstanding the Kasler Report's advice that a PUD/PCD zoning

ordinance should be "accomplished along with a modification to the municipal master

plan," no subsequent modification or reexamination of Ocean Township's Master Plan

was undertaken by the Defendants. Indeed, the Planning Board was undertaking a

reexamination of the Township's Master Plan at this time, and issued its Master Plan

Reexamination Report on October 13, 2004 (the "October 13, 2004 Reexamination

Report") – just two days before the date of the Kasler Report . The Planning Board did

not even make a reference to the Property in the October 13, 2004 Reexamination

Report, much less recommend that the Property be rezoned for Planned Unit

Development or a Planned Commercial Development.

49. On November 2, 2004, the voters of Ocean Township defeated the

referendum on whether to enact an open space tax to fund.

50. The defeat of the open space tax referendum effectively ended the Mayor

18

& Council's hopes that it would be able to fund a condemnation of the Plaintiffs' Property. The Mayor and Council construed the defeat of the open space tax as an indication that taxpayers were not willing to pay millions of dollars to buy the Property.

51.   Shortly after the election, Senator Joseph Palaia and Mayor Larkin jointly cut the ribbon for the newly renovated Azzolina Foodtown. Councilman Siciliano and Ocean Township Councilman David Hiers were present at this ceremony and appeared in photographs in local papers along with Assemblymen Joseph Azzolina and members of his family and employees.

52.   With the completion of the Kasler Report and the voters' defeat of the open space tax referendum, the frequency with which the Planning Board secretary scheduled hearings began to increase. Plaintiffs were able to proceed with their application at hearings on November 30; January 31, 2005; and March 21, 2005.

53.   At the end of January, 2005, the Mayor made several public comments in which he indicated that the Council will have "to be realistic about it" and that "there's going to be something there." Mayor Larkin told a reporter at about this time, "You can't prevent a property owner from using that property." Notwithstanding the Mayor's seeming acknowledgment that the commercial development of the site was inevitable, the Mayor & Council proceeded with their efforts to prevent the project from being developed with Stop & Shop as a tenant.

54.   The Mayor & Council had specially retained land use attorney Sanford Brown, Esquire, to study the Kasler Report. Brown recommended that the Township hire another planner, Marc R. Schuster, to examine a rezoning, evaluate Kasler's study and prepare alternate zoning ordinances.

19

55.     On January 26, 2005, the Mayor & Council voted to hire planner Marc R. Schuster at an estimated cost of $4,500 to examine a rezoning of the Property, evaluate the Kasler Report and prepare alternate zoning ordinances for the Mayor & Council's consideration. Schuster was required to report back to the Council in 30 days.

56.     The Defendants have, over the past 10 years, changed the Township's zoning on numerous occasions. Upon information and belief, the Mayor & Council retained Kasler, Brown and Schuster in this case not to obtain objective advice regarding how the Property should best be zoned, but rather to ensure that the steps they were going to take to rezone the Property and derail Plaintiffs' Site Plan Application would withstand judicial challenge. Councilman Siciliano acknowledged that the reason that the Mayor & Council had hired two planners to advise them was to make sure their efforts to change the zoning would be successful. Siciliano stated "We want to make absolutely sure every decision we make will pass the acid test. It's going to stand up without being challenged."

57.     Councilman Siciliano also made public comments that clearly revealed the purpose of the Mayor & Council's efforts. Siciliano acknowledged to a reporter that he was concerned that there would be casualties in a "supermarket war" and that other nearby stores could close their doors, leaving the township scrambling for tenants.

58.     Councilman Siciliano was referring to the Azzolina Foodtown.

59.     In response to the suggestion that competition between food stores might benefit consumers, Siciliano stated that "Stop & Shop will not benefit customers – who

are they kidding? . . . . That will be counterproductive. You pick up one ratable and

lose another."

60.     Councilman Siciliano's efforts to prevent competition against the Azzolina

Foodtown were even bolstered by letters to the editor supporting Siciliano. For

example, in a letter to the editor published in the Asbury Park Press on November 27,

2004, Fran Rizzo, a resident of Middletown, New Jersey wrote:

> Even though I live in Middletown, I love Ocean Township and its beautiful
> neighborhoods, so I've been following the articles on the opposition to the
> Stop 'n' Shop at Deal Road.
>
> I have to agree with Councilman Chris Siciliano. Why does that area need
> another supermarket when Foodtown was just renovated and Wegmans
> just opened? Preserve the land and use other markets.

Middletown is approximately 12 miles north of Ocean Township, and is the home town

of Joseph Azzolina.

61.     Upon information and belief, this letter was part of an effort orchestrated

by the owners of the Azzolina Foodtown to give political support to Councilman Siciliano

and the Mayor & Council in support of their plan to amend the zoning of the Property to

prevent Stop & Shop from opening across the street from the Azzolina Foodtown and

competing with them.

62.     The Mayor and the remainder of the Council shared Councilman

Siciliano's desire to amend the zoning ordinance applicable to the Property to prevent

Stop & Shop from opening a store on this site, and to otherwise mollify and cater to the

owners of the Azzolina Foodtown and nearby residential property owners.

63.     The Kasler Report is revealing both for what it says and for what it does

not say with regard to alternative commercial zoning alternatives available to the

Council in the event it were to rezone the Property. The focus of the Report's discussion of available commercial zoning alternatives was focused on only two issues – both of which reveal an intent on the part of Defendants to discriminate and act arbitrarily against Plaintiffs: First, in discussing alternative commercial zoning options, the Report focuses solely on which commercial zoning option would result in the fewest number of curb cuts along Deal Road and Highway 35. For example, the Kasler Report dismissed applying the Township's C-1 or C-3 zoning, stating that they "are not viable alternative zoning for the subject property as the lot sizes are too small. . . . [T]his site requires a more comprehensive development which will result in less curb cuts along Deal Road and Route 35." The Report also rejected the C-4 zoning (regional commercial zone) because, at 31 acres, the Property was less than the 40 acre minimum lot area required in the C-4 Zone. The Report identified the C-2 Zone – which permits the same uses as the CDO Overlay Ordinance, "as a better alternative for this site due to its larger lot size requirement (2 acres)," but then proceeded to dismiss this approach on the ground that C-2 zoning could yield as many as 15 lots on the site which would create too many curb cuts and is therefore unadvisable."

64. The CDO Overlay Ordinance permits all of the uses allowed in the C-2 Zone, and limits the number of curb cuts that could be used to three, only two of which -- one at the light on Deal Road opposite Logan Road, and one near the northern boundary of the Property on Highway 35 – were proposed to be constructed by Plaintiffs in the Site Plan Application. Yet, the Kasler Report does not discuss the Township's CDO Overlay Ordinance in this section as an alternative, or compare any of the foregoing Ocean Township commercial zoning alternatives to the CDO Overlay

22

Ordinance.

65.    The last line of the Kasler Report's section discussing available commercial zoning options contains an equally telling line: "There is also concern with over saturation of the retail market as the entire Route 35 corridor is commercial in nature." This sentiment is entirely inconsistent with that set forth in the November 30, 2000 Master Plan Reexamination Report, wherein the Planning Board's Planner recommended that the Property be developed as an "integrated commercial development . . . that should include the uses which are permitted in the C-2 Zone."

66.    No subsequent Master Plan Reexamination Report adopted by the Planning Board has referenced any concerns about "over saturation of the retail market" along the Route 35 corridor.

67.    Upon information and belief, this reference to "the concern with over saturation of the retail market" in the last sentence of the Kasler Report's discussion of available commercial zoning alternatives reflected the Mayor & Council's expressed desire to Kasler that the report provide a basis for preventing Stop & Shop from proceeding with its application and opening a store on the Property of a size that could compete with the Azzolina Foodtown.

68.    Nowhere in the Kasler Report's discussion of available commercial zoning alternatives is there any discussion of what types of commercial uses might be advisable or suitable for the Property.

69.    Marc Schuster, the third planner in less than 5 years that the Township engaged to propose a re-zoning for the Property, prepared a "Consistency Report," dated April 15, 2005 (the "April 15, 2005 Schuster Consistency Report"), in which he

23

sought repeatedly to rely upon vague language in the October 13, 2004 Reexamination

Report to justify the Defendants' decision not to reexamine or amend the Master Plan

as part of their consideration of a new zoning for the Property, which decision was flatly

contrary to the advice set forth in the Kasler Report:

> Based upon the continuance of the problems enunciated in  the October
> 13, 2004 reexamination report, it became necessary to once again
> consider a modification to the existing zoning in order to provide for
> increased flexibility and a more balanced use of land. The current zoning
> change is limited to Block 33, Lot 19.01.

The April 15, 2005 Schuster Consistency Report went on to describe the "two (2) major

conflicting characteristics" of this Property – the "clearly" non-residential environment of

Route 35 and the "less intense nature" of the Deal Road frontage of the Property, and

concluded that "[a]dditional land use revisions are, therefore, warranted."

70.     The April 15, 2005 Schuster Consistency Report proceeds to state:

> In order to effectuate a balanced and efficient use of land on Block 33, Lot
> 19.01, it has been designated as a Community Mixed-Use zone.  This
> designation of Lot 19.01 as a Community Mixed-Use zone will ensure that
> it is developed in a manner that is consistent with both the character and
> nature of both the Route 35 and the Deal Road corridors.  Such a
> designation will assure a type of development that is characterized as a
> Village Square, which will be welcomed by the community as an asset
> while taking advantage of the site's prime Route 35 location.

71.     A second report, referred to as a "Planning Report," was prepared by Mr.

Schuster dated May 13, 2005 (the "May 13, 2005 Schuster Planning Report").  This

report repeated some of the discussion contained in the April 15, 2005 Schuster

Consistency Report, and also set forth much of the language of the Ordinance.

72.     On May 11, 2005, two days before the date of the May 13, 2005 Schuster

Planning Report, the Defendant Mayor & Council introduced the Ordinance essentially

24

as proposed by Schuster, without prior notice to Plaintiffs, without first adopting an ordinance authorizing and setting forth standards as required by the Municipal Land Use Law governing Planned Developments within the Township, and without amending the Master Plan.

73.    The Ordinance proposed by Schuster and introduced by the Mayor & Council was not consistent with the Township's Master Plan and was not even consistent with the purported justification for rezoning Ordinance provided by Schuster in his Consistency Report.  For example, although Schuster purported to justify the need for the rezoning on the basis of the differences between the highly intensive retail environment of the Route 35 frontage of the Property and the need for less intensive development along the Deal Road frontage, the Ordinance permits retail throughout the entire Property, and permits only retail – including all of the same uses permitted by the CDO Overlay Ordinance -- along the entire Deal Road frontage.

74.    On May 16, 2005, at a regular meeting of the Defendant Planning Board, the Board considered the Ordinance pursuant to N.J.S.A. 40:55D-26(a) for the purpose of determining whether the Ordinance was consistent with the Master Plan.  By a vote of 5-2, with two members of the Board recusing themselves, the Board voted to recommend to the Mayor and Council that the Ordinance is consistent with the intent and purposes of the Master Plan, noting that both the then existing zoning and the zoning proposed by the Ordinance included provisions for the construction of retail, office and residential space.

75.    On May 25, 2005, the Mayor and Council held a public hearing on the Ordinance, at which numerous members of the public spoke both for and against the

25

Ordinance. Plaintiffs, through counsel, objected to the Ordinance and the proposed
change of zoning. At the conclusion of the Ordinance, the Mayor and Council voted
unanimously to adopt the Ordinance.

76.     Notice of the adoption of the Ordinance was published in the Asbury Park
Press on Friday, May 27, 2005.

77.     The Ordinance became effective on June 15, 2005 – one day before the
Plaintiffs were scheduled to present their last day of testimony in support of their
application.

78.     In light of the adoption of the Ordinance, which dramatically changed the
nature of the zoning of the Property, and which effectively prohibited Plaintiffs'
proposed use of a portion of the Property for a Stop & Shop food store, Plaintiffs were
unable to proceed at the special meeting of the Planning Board scheduled for June 16,
2005, which hearing would have been Plaintiffs' final evening of testimony in support of
the Ocean Gate Commons Application.

78.     The Ordinance changed the zoning applicable to Block 33, Lot 19.01, in
three principal respects: First, it eliminated the Commercial Development Option (the
"CDO Overlay Ordinance") that had been in effect since the purchase of the property by
Ocean 35 Acquisition and pursuant to which the plaintiffs' application for major site plan
approval had been pending since May, 2003. Second, it eliminated the underlying
zoning for Block 33, Lot 19.01, which had long permitted development of the majority
of the property in accordance with the Township's O-1/80 zoning, and the easternmost
portion of the Property in accordance with R-1T, or single-family zoning. Third, it
created new zoning – applicable only to the Property, and to no other lot in the entire

Township, which new zoning is called the "C-6, Community Mixed-Use District."

79.    According to the Ordinance, the C-6 Zoning provides for a "Village Square-type development which encourages a variety of uses with storefronts at a pedestrian scale, residential components which enliven a community and plazas and open spaces encouraging public gatherings and interaction." The ordinance requires a minimum of 28 acres. As envisioned by Marc Schuster and described in the April 15, 2005 Consistency Report, this "Village Square-type of development . . . provides for a safe and lively environment with extended periods of activity in an area of the Township where impacts must be tempered."

80.    In fact, the new C-6, Community Mixed-Use District, zoning singles out Plaintiffs' Property and requires as a condition of developing the Property that Plaintiffs comply with an extraordinarily detailed and onerous series of restrictions and requirements – which take up six pages – and which dictates all manner of costly criteria that will govern the development, and sets forth a long series of extraordinarily burdensome and costly conditions that new zoning imposes upon and exactions demanded from the Plaintiffs.

81.    The 28-acre minimum land requirement imposed by the Ordinance is a substantial increase in the minimum requirement under either the O-180 Zoning or the R-1T Zoning, and effectively prevents Plaintiffs from making any use of their Property whatsoever unless they commit to all of the conditions and exactions imposed by the Ordinance.

82.    This 28-acre minimum lot size is equal to the net amount of land that would remain after the installation of the near and far-side jughandles that were

27

required under the CDO Overlay Ordinance, and which are also a requirement of the C-6 Zoning established by the Ordinance.

83.    The Ordinance requires essentially the same entrance configuration as that proposed by the Plaintiffs in the Site Plan Application and permits all of the commercial uses that Plaintiffs described as likely to be tenants in the proposed development.  The Ordinance not only permits as much commercial development as Plaintiffs would have been able to develop without any lot coverage, density or parking variances, it would enable Plaintiffs to develop an additional nearly 70,000 square feet of office and residential space.  Aside from the burdensome and costly design and details regulations and numerous exactions of property and improvements for public purposes, the only difference between this Ordinance and the CDO Overlay Ordinance, is that the Ordinance provides that only two retail uses can be larger than 10,000 square feet: one of up to 20,000 square feet, and one of up to 30,000 square feet. This latter provision effectively bars Plaintiffs from developing a Stop & Shop food store on the Property that would be able to compete effectively against the Azzolina Foodtown.

## FIRST COUNT

### (42 U.S.C. § 1983: Inverse Condemnation and Taking in Violation of the Fifth Amendment of the United States Constitution)

84.    Plaintiffs repeat and restate the allegations contained in paragraphs 1 through 83 above and incorporate the same herein as if set forth at length.

85.    The Takings Clause of the Fifth Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment

28

provides that, "[N]or shall private property be taken for public use, without just compensation."

86.     The Ordinance adopted by Defendants constitutes an unconstitutional taking of Plaintiffs' property without just compensation, in violation of the Plaintiffs' constitutional rights pursuant to the Fifth and Fourteenth Amendments, and their civil rights as protected by N.J.S.A. 42 U.S.C. § 1983.

87.     By eliminating the prior zoning and adopting the C-6, Community Mixed-Use District zoning, the Defendants have imposed an egregious taking on the Plaintiffs. The effect of the Defendants' actions in adopting the Ordinance is to unconstitutionally exact from Plaintiffs, as a condition of their developing the Property for any use whatsoever, the following dedications of land and public improvements:

    a.    Plaintiffs must open the Property to the public at large and create an "attractive and inviting" Village Square for the Township of Ocean community, complete with "plazas and open spaces encouraging public gatherings and interaction," and will effectively be required to allow those who attend and participate in these public gatherings to use Plaintiffs property and park in Plaintiffs' parking facilities;

    b.    Plaintiffs must provide "[p]ublic open space and seating areas . . . throughout the development.  The Ordinance even requires that the plaza include "seating and fountain and/or water elements;"

    c.    The Ordinance requires that Plaintiffs dedicate the necessary land to construct a "far side jughandle" at the northeast corner of the intersection of Deal Road and Route 35 and a "near side jughandle," or bypass lane, from Deal Road westbound to Route 35 northbound, and that they bear the entire cost of these improvements, which Plaintiffs estimate will cost well in excess of $1.5 million, not including the value of this prime intersection property that Plaintiffs are required to forfeit to provide these road improvements; and

    d.    Plaintiffs must dedicate the land and pay to install "[i]nternal

29

> pedestrian walkways . . . between the site improvements and the
> [Township] library site to the east."

88.     The requirement of the Ordinance that Plaintiffs construct "[p]ublic open

space and seating areas . . . throughout the development" and that it set aside land and

construct "plazas and open spaces encouraging public gatherings and interaction" and

provide "[i]nternal pedestrian walkways . . . between the site improvements" and the

Township Library to the east, which in turn is bordered by Joe Palaia Park, effectively

requires Plaintiffs to open their land to the public at large, and deprives them of their

valuable rights in their Property. It is the purpose and effect of the Ordinance to impose

upon the Plaintiffs, as the price Plaintiffs must pay to develop any portion of their 31-

acre tract, the cost of setting aside valuable land and making "Village Square-type"

improvements upon their property for the benefit of citizens of Ocean Township and the

public at large.

89.     This overall exaction from Plaintiffs of their right to keep the public at large

from coming upon their Property, and each individual public plaza, gathering area,

water treatment, public walkway and sidewalk that the Ordinance purports to obligate

Plaintiffs to set aside land to accommodate and to build as a condition of developing

their Property, is an unconstitutional exercise of the Defendants' statutory authority

under the MLUL, and violates Plaintiffs' constitutional rights under the Fifth and

Fourteenth Amendments.

90.     In the event or to the extent the exactions the Ordinance imposes upon

Plaintiffs in requiring them to open their Property to the public, and to create public

plazas and seating areas throughout the development and to construct public walkways

linking the site to the Library are constitutionally permissible, they nevertheless constitute an inverse condemnation or taking of Plaintiffs' valuable rights in the Property for which Defendants must pay Plaintiffs just compensation.

91. The requirement of the Ordinance that Plaintiffs construct jughandle and bypass improvements upon its land at the northeast corner of Highway 35 and Deal Road imposes upon Plaintiffs the burden of dedicating more than 2 acres of prime intersection land and the entire multi-million cost of making highway and intersection improvements to correct an intersection that is already extremely overburdened by existing traffic conditions in the Township.

92. The Ordinance's exaction of the required land and the entire cost of these improvements from Plaintiffs, when only a small percentage of the need for these improvements would be attributable to the development of the Property, constitutes a an inverse condemnation or taking of Plaintiffs' property for which Defendants must pay "just compensation."

93. The Ordinance is not one of general applicability. Rather, the Ordinance was specifically adopted for, and solely applicable to, Plaintiffs' property.

94. The Ordinance effectively mandates that Plaintiffs turn over significantly more than 10% of the property for use by the public.

95. Defendants have not paid, or offered to pay, Plaintiffs for the property taken by the Ordinance.

96. Since the effective date of the Ordinance on June 15, 2005, the Ordinance has effectively imposed upon the Property a reservation of areas of the Property for public use, for which Defendants are obligated to compensate Plaintiffs.

31

97.     The full value of the property that the above-described provisions of the

Ordinance will ultimately take from Plaintiffs cannot be calculated with sufficient

certainty at this time, and will not be known until such time, if ever, Plaintiffs succeed in

obtaining approvals to develop the Property.

98.     The actions of Defendants Ocean Township, Mayor and Council of Ocean

Township and the Ocean Township Planning Board as described herein have deprived

plaintiffs of well-established federal rights, including the right under the Fifth and

Fourteenth Amendments of the United States Constitution to be free from

unconstitutional takings of their property, and the right to receive just compensation for

the taking of property

**WHEREFORE,** Plaintiffs seek judgment against Defendants Ocean Township,

Mayor and Council of Ocean Township and the Ocean Township Planning Board as

follows:

a.      declaring that the Ordinance's requirements that Plaintiffs develop
        their property as a Village Square-type development for the benefit
        of the citizens of OceanTownship and that they set aside land and
        construct public plazas, seating areas, walkways and other facilities
        and amenities to serve the public, bear no valid nexus to Plaintiffs'
        proposed development and constitute an unconstitutional exaction
        of public improvements from Plaintiffs and an unconstitutional
        inverse condemnation of Plaintiffs' valuable rights in its property;

b.      declaring in the alternative that the Ordinance's requirements that
        Plaintiffs give up their rights to keep the general public from their
        Property, public plazas and seating areas throughout the
        development, and public sidewalks serving adjacent public uses
        constituted an inverse condemnation of Plaintiffs' valuable rights in
        its property and an unconstitutional taking of Plaintiffs' property,
        without just compensation;

c.      declaring that the Ordinance's requirements that Plaintiffs dedicate
        land and bear the entire cost of constructing the jughandle and

32

bypass improvements constitutes an inverse condemnation of Plaintiffs' valuable rights in its property and an unconstitutional taking of Plaintiffs' property, without just compensation;

d.      awarding Plaintiffs just compensation for the value of the property taken by Defendants;

e.      awarding Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 or other applicable law; and

f.      granting Plaintiffs such other relief as the Court shall deem equitable and just.

## SECOND COUNT

### (Unlawful Taking in Violation of Article 1, Paragraph 20 of the New Jersey Constitution)

99.     Plaintiffs repeat and restate the allegations contained in paragraphs 1 through 83 above and in the First Count and incorporate the same herein as if set forth at length.

100.    Article 1, Paragraph 20 of the New Jersey Constitution states in relevant part that, "Private property shall not be taken for public use without just compensation."

101.    The Ordinance constitutes an inverse condemnation of Plaintiffs' Property.  To the extent that such an inverse condemnation is permissible, Defendants are required by the New Jersey Constitution to pay Plaintiffs just compensation for the value of the property that in being taken.

**WHEREFORE,** Plaintiffs seek judgment against Defendants Ocean Township, Mayor and Council of Ocean Township and the Ocean Township Planning Board as follows:

a.      declaring that the Ordinance's requirements that Plaintiffs develop their property as a Village Square-type development for the benefit

33

of the citizens of Ocean Township and that they set aside land and construct public plazas, seating areas, walkways and other facilities and amenities to serve the public, bear no valid nexus to Plaintiffs' proposed development and constitute an unconstitutional exaction of public improvements from Plaintiffs and an unconstitutional inverse condemnation of Plaintiffs' valuable rights in its property;

b.   declaring in the alternative that the Ordinance's requirements that Plaintiffs give up their rights to keep the general public from their Property, public plazas and seating areas throughout the development, and public sidewalks serving adjacent public uses constituted an inverse condemnation of Plaintiffs' valuable rights in its property and an unconstitutional taking of Plaintiffs' property, without just compensation;

c.   declaring that the Ordinance's requirements that Plaintiffs dedicate land and bear the entire cost of constructing the jughandle and bypass improvements constitutes an inverse condemnation of Plaintiffs' valuable rights in its property and an unconstitutional taking of Plaintiffs' property, without just compensation;

d.   awarding Plaintiffs just compensation for the value of the property taken by Defendants;

e.   awarding Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 or other applicable law; and

f.   granting Plaintiffs such other relief as the Court shall deem equitable and just.

## THIRD COUNT

### (Article I, Commerce Clause, of the United States Constitution, the "Dormant Commerce Clause")

102.   Plaintiffs repeat and restate the allegations contained in Paragraphs 1

through 83 and all of the allegations of the First and Second Counts and incorporate the

same herein as if set forth at length.

103.   The Ordinance's restriction permitting only two retail uses to exceed

10,000 square feet in size and prohibiting any retail use from exceeding 30,000 square

34

foot in size (hereinafter the "Size Restriction") effectively bars Stop & Shop from opening a food store that can compete with the Azzolina Foodtown.

104.    The Defendant Mayor & Council's intent and purpose in adopting the Ordinance and the Size Restriction was to prevent Stop & Shop from opening a food store that can compete effectively with the Azzolina Foodtown.

105.    The effect of the Ordinance and the Size Restriction is to prevent Stop & Shop from opening a food store on the Property that can compete effectively with the Azzolina Foodtown.

106.    The purpose, intent and effect of the Ordinance and the Size Restriction is to ensure that the largest remaining undeveloped commercial tract on the Highway 35 corridor, and a tract that is ideally suited for a food store generally and in particular for a food store that intended to compete head-to-head with the Azzolina Foodtown, could not be used as a food store, unless the food store was less than the 30,000 square foot maximum limitation of the Size Restriction, and therefore too small to compete effectively against the Azzolina Foodtown.

107.    The benefits that the Size Restriction will provide for the public health, safety and welfare, or for the Township's Master Plan, are nonexistent and such as they could conceivably exist are greatly outweighed by the burden the Ordinance imposes on interstate commerce and on consumers.

108.    The Size Restriction, and such other provisions of the Ordinance that will operate to effectively bar Stop & Shop from opening a food store that can compete with the Azzolina Foodtown, violates the negative aspect of the Commerce Clause of the United States Constitution, which is commonly referred to as the "dormant commerce

35

clause." The dormant commerce clause prohibits state and local laws that are protectionist, *i.e.*, those that burden out-of-state competitors while providing a competitive benefit to in-state interests. Even when a law is not facially discriminatory, it will be invalidated if its primary negative impact is on out-of-state interests, while providing competitive benefits to in-state interests. Courts will infer a protectionist intent behind laws that impose substantial burdens on interstate competitors with minimal or nonexistent benefits to the public health, safety and welfare. Even in the absence of protectionism, state laws will be invalidated when the burdens on interstate commerce greatly exceed the benefits.

**WHEREFORE,** Plaintiffs seek judgment against Defendants Ocean Township, Mayor and Council of Ocean Township and the Ocean Township Planning Board as follows:

      a.    declaring the Size Restriction of the Ordinance to be invalid and unconstitutional and in violation of the dormant commerce clause;

      b.    enjoining the enforcement of the Size Restriction of the Ordinance on the ground that it is unconstitutional and in violation of the dormant commerce clause;

      c.    awarding Plaintiffs their reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. § 1988; and

      d.    granting Plaintiffs such additional relief as the Court may deem equitable and just.

## FOURTH COUNT

### (Declaratory Judgment: Reverse Spot Zoning)

109. Plaintiffs repeat and restate the allegations contained in Paragraphs 1 through 83 and all of the allegations of the First through Third Counts and incorporate the same herein as if set forth at length.

110. Reverse spot zoning is a land-use decision which arbitrarily singles out a particular parcel for different, less favorable treatment than the neighboring ones.

111. The Ordinance is invalid, as it constitutes reverse spot zoning.

112. The Ordinance applies solely to the Plaintiffs' Property and imposes upon that Property -- and no other Property in the Township, all manner of costly and burdensome obligations and conditions.

113. The Ordinance also rescinds the O-1/80 Zoning and the R-1T commercial zoning applicable to the Property and Commercial Development Overlay option and re-zones Block 33, Lot 19.01 as a C-6, Community Mixed-Use District.

114. The minimum tract size is set at 28 acres, precisely the amount of net land left after the jughandle and by-pass are constructed as required by the Ordinance, prohibiting the Plaintiffs from developing any portion of the whatsoever Property unless they accede to the numerous exactions and burdens imposed by the Ordinance. The prior O-1/80 Zoning had previously allowed development of lots as small as 2 acres, and even the CDO Overlay Ordinance had required a minimum lot size of only 20 acres.

115. Plaintiffs' property is the only parcel in Ocean Township that is zoned C-6, Community Mixed-Use District. The Community Mixed-Use District established by the

37

Ordinance is an entirely new type of district in Ocean Township that is defined in great detail over six pages of the Ordinance rather than by referring to the existing municipal zoning law.

116.    The Ordinance imposes enormously burdensome and costly exactions on the Property, including the obligation to set aside land for, and to construct, public road improvements designed in major part to resolve existing traffic problems unrelated to the development of the site; to set aside land for, and to construct, plazas and seating areas "throughout the development" and to develop those plaza with fountains or other water treatments; to locate "all parking . . . in a fashion so that it is not visible from Route 35 or Deal Road, effectively requiring that some if not all parking be located underground.

117.    The Ordinance even goes so far as to mandate that pedestrian pathways be constructed of a "variety of materials, including stamped concrete, cobblestones, and brick . . . to add interest" and that "[p]aving materials along the building frontage shall include a variety of materials, such as broom-finished concrete for the walking area and bricks or other pavers for the tree planting areas along the curb." The Ordinance even specifies that "[o]rnamental lighting fixtures shall be provided along the sidewalks, building frontages and within the parking areas."

118.    No other zoning district in Ocean Township imposes detailed requirements such as the exactions and requirements described above.

119.    The Ordinance allows all uses permitted in the Township's C-2 zone, which include grocery stores and supermarkets, as well as numerous other individual uses that are contained within a typical Stop & Shop store operated by Plaintiffs. These

38

include bakeries, butcher stores, stores selling dairy products at retail, drugstores and pharmacies, delicatessens, florist, food products, fruit and vegetable market, greeting card store, grocery store and seafood store.

120.   Every use proposed by Plaintiffs in their site plan application continues to be permitted by the Ordinance. The only difference between the uses proposed in Plaintiffs' Site Plan Application and the new zoning permitted by the Ordinance with respect to commercial uses is that the Ordinance does not permit any retail stores in excess 30,000 square feet and allows only two stores to be larger than 10,000 square feet.

121.   No other section of Ocean Township's commercial zoning ordinances limits the maximum size of a permitted commercial use, except as a consequence of limitations on the bulk size or square footage of the building.

122.   At the same time, the Ordinance allows a total of 239,057 square feet of development – which is approximately 25% more than the amount Plaintiffs had proposed to develop in its conceptual plan before the Planning Board. Specifically, the Ordinance permits 170,755 square feet of retail development – about the same amount that Plaintiffs could have build pursuant to the CDO Overlay Ordinance without seeking any variances from the applicable building coverage, floor area ratio or parking space requirements, and an additional nearly 68,302 square feet of second floor residential and office development. Plaintiffs had proposed no office or residential uses in their site plan application.

123.   The Ordinance is arbitrary and capricious in the extensive and costly burdens it imposes solely on a single property owner within the Township.

---

124.   The Defendants' change of zoning of Plaintiffs' property was not motivated by any legitimate concern over health and safety, or to further the Master Plan, or even over a desire to reduce the amount of development of the site, but rather simply to block Plaintiffs – or anyone else – from developing a food store on this site that would compete with the Azzolina Foodtown and other food stores in the Township.

125.   In adopting the Ordinance without first amending the Township's Master Plan, the Defendants specifically rejected the opinion of their second planner in the Kasler Report who advised that any Planned Commercial Development Ordinance or Planned Unit Develop Ordinance prepared for Plaintiffs' Property "should be accomplished along with a modification to the municipal master plan."

126.   Defendants enacted this extraordinarily burdensome Ordinance without either reexamining or modifying the Township's Master Plan.

127.   The Ordinance is not consistent with the Master Plan, and the Defendant Planning Board's 5-2 determination that the Ordinance is consistent therewith was arbitrary and capricious.

**WHEREFORE**, Plaintiffs seek judgment against Defendants Ocean Township, Mayor and Council of Ocean Township and the Ocean Township Planning Board as follows:

  a. declaring the Ordinance to be invalid because it constitutes reverse spot zoning;

  b. declaring the Ordinance to be invalid because it is inconsistent with the Township's Master Plan, and its enactment was otherwise arbitrary and capricious;

  c. awarding Plaintiffs their reasonable attorneys' fees and costs of suit; and

40

d.    granting Plaintiffs such additional relief as the Court may deem equitable and just.

## FIFTH COUNT

### (Violation of the Municipal Land Use Law – Violation of Statutory Provisions Authorizing and Governing Planned Developments)

128.   Plaintiffs repeat and restate the allegations contained in Paragraphs 1 through 83 and all of the allegations of the First through Fourth Counts and incorporate the same herein as if set forth at length.

129.   The Kasler Report recommended that the Property be developed "as a whole to help insure as few curb cuts as possible."  The Kasler Report went on to recommend that the Defendants rezone the property to a Planned Commercial Development.

130.   The Municipal Land Use Law defines a Planned Commercial Development ("PCD") as follows:

> "Planned commercial development" means an area of a minimum contiguous or noncontiguous size as specified by ordinance to be developed according to a plan as a single entity containing one or more structures with appurtenant common areas to accommodate commercial or office uses or both and any residential and other uses incidental to the predominant use as may be permitted by ordinance.

131.   The Township has not adopted a discretionary provision of its subdivision or site plan ordinances, as specifically authorized by N.J.S.A. 40:55D-39(b) and (c), setting forth provisions for PCDs.

132.   Defendants failed to follow the recommendation contained in the Kasler Report and amend the Township's land development ordinance to create PCDs within

41

the Township and to rezone the Property to permit them.

133.    Instead, apparently because time was of the essence and the Township needed to act quickly to derail Plaintiffs' site plan application, Defendants took an impermissible shortcut and adopted the Ordinance, which attempts to incorporate into the C-6 Zone requirements the kinds of allocations of uses that N.J.S.A. 40:55D-39 of the Municipal Land Use Law requires be set forth generally in the municipality's ordinances governing approval of subdivisions and site plans and in particular governing the provisions for Planned Developments.

134.    In so doing, and by seeking to circumvent the Planned Development process set forth in the Municipal Land Use Scheme, the Defendant Mayor & Council dictated in the C-6 Zoning Ordinance its determination as to what the "basic scheme of the planned development ought to be" and thereby impermissibly deprived the Defendant Planning Board of the discretion and authority the Legislature delegated to it pursuant to the Planned Development provisions of the MLUL.

135.    By attempting to couch these extraordinarily burdensome Ordinance restrictions as simply new requirements in the newly created C-6 Zone, instead of as the PCD provisions that the Kasler Report properly recognized they would be, the Defendants also were seeking to circumvent the MLUL's restrictions and requirements applicable to Planned Developments, and to impermissibly narrow the role of the Planning Board pursuant to N.J.S.A. 40:55D-43 to make specific findings of facts and conclusions with respect to each Planned Development.

136.    The Ordinance imposes conditions and restrictions on the development of the Property that cannot be imposed except in accordance with the provisions

42

governing Planned Developments set forth in the Municipal Land Use Law.

137.    The Ordinance's provisions allocating and apportioning uses within the Property, restricting the maximum size of commercial uses, requiring the dedication of public space and seating areas, and imposing detailed criteria governing the walkways, water treatments, building and sidewalk textures and finishes, aesthetic requirements for lighting fixtures, and similar provisions are therefore arbitrary and capricious and otherwise void and unenforceable.

138.    Alternatively, in the event the Ordinance is determined to be a Planned Development ordinance it fails to satisfy the requirements of the Municipal Land Use Law governing such ordinances and its enactment was arbitrary and capricious, invalid and otherwise unenforceable.

**WHEREFORE,** Plaintiffs seek judgment against Defendants Ocean Township, Mayor and Council of Ocean Township and the Ocean Township Planning Board as follows:

> a.     declaring that the Ordinance contravenes the Municipal Land Use Law's provisions governing Planned Developments and is otherwise an arbitrary and capricious exercise of the Defendants' authority under the Municipal Land Use Law and is void and enforceable;
>
> b.     declaring the Ordinance to be invalid because it is inconsistent with the Township's Master Plan, and its enactment was otherwise arbitrary and capricious;
>
> c.     awarding Plaintiffs their reasonable attorneys' fees and costs of suit; and
>
> d.     granting Plaintiffs such additional relief as the Court may deem equitable and just.

## SIXTH COUNT

### (Violation of the Municipal Land Use Law – Space Restrictions are Arbitrary and Capricious)

139.    Plaintiffs repeat and restate the allegations contained in Paragraphs 1 through 83 and all of the allegations of the First through Fifth Counts and incorporate the same herein as if set forth at length.

140.    The Space Restrictions are arbitrary and capricious, beyond the Defendants' authority to enact pursuant to the Municipal Land Use Law and otherwise void and unforceable.

        a.    declaring that the Space Restrictions, both generally and as applied to Plaintiff Stop & Shop, contravene the Municipal Land Use, are arbitrary and capricious exercise of the Defendants' authority under the Municipal Land Use Law and are void and enforceable;

        b.    awarding Plaintiffs their reasonable attorneys' fees and costs of suit; and

        c.    granting Plaintiffs such additional relief as the Court may deem equitable and just.

## SEVENTH COUNT

### (42 U.S.C. § 1983 – Fifth and Fourteenth Amendments of the United States Constitution -- Violation of Due Process)

141.    Plaintiffs repeat and restate the allegations contained in paragraphs 1 through 83 above and all of the allegations of the First through Sixth Counts and incorporate the same herein as if set forth at length.

142.    Upon information and belief, the Defendants' sought to delay Plaintiffs' Site Plan Application in order to allow sufficient time for the efforts the Defendants

44

made to obtain a source of funding to condemn the Property and to devise a strategy and line up the experts that would be needed to prepare a foundation for rezoning the Property that would withstand judicial attack, and to provide those experts with sufficient time within which to prepare the necessary reports and new zoning Ordinance language.

143.    Upon information and belief, the Defendants impermissibly attempted to delay Plaintiffs' application periodically in order to provide Defendants with sufficient time to undertake the efforts described herein to derail Plaintiffs' Site Plan Application.

144.    Upon further information and belief, another element of Defendants' efforts to delay Plaintiffs' efforts to proceed with the Site Plan Application included requiring or requesting through the Defendants' professional staff that Plaintiffs submit revised and alternative plans, or that Plaintiffs submit extensive testimony with respect to various issue.

145.    These efforts and requests resulted in prolonged delays in the Plaintiffs' ability to present its Site Plan Application, and caused Plaintiffs to bear the interest and property tax expense of carrying the Property, and to incur extensive and unnecessary design and professional costs in complying with the requests for additional information and made by the Defendants and their professionals.

146.    Upon further information and belief, at the time Defendants undertook these efforts, the Defendant Mayor & Council knew that they were going to rezone the Property to derail the Plaintiffs' Site Plan Application, and that the effort and expense they were asking Plaintiffs to undertake were going to be wasted and without value.

147.    The actions of the Defendants as described herein violated Plaintiffs'

rights to due process.

148.    As a result of the violation of Plaintiffs' rights to due process, the Plaintiffs have incurred damages.

149.    Unless Plaintiffs' obtain an injunctive relief prohibiting such violations from occurring in the future, such violations are likely to happen again at such time as Plaintiffs proceed with their efforts to obtain site plan approval to develop their Property.

**WHEREFORE,** Plaintiffs seek judgment against Defendants Ocean Township, Mayor and Council of Ocean Township and the Ocean Township Planning Board as follows:

        a.    enjoining the Defendants in the future from delaying Plaintiffs' site plan application;

        b.    awarding Plaintiffs their damages for losses incurred as result of Defendants' violation of Plaintiffs' due process rights;

        c.    awarding Plaintiffs their reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. § 1988; and

        d.    granting Plaintiffs such additional relief as the Court may deem equitable and just.

## EIGHTH COUNT

### (New Jersey Constitution – Violation of Due Process)

150.    Plaintiffs repeat and restate the allegations contained in paragraphs 1 through 83 above and all of the allegations of the First through Seventh Counts and incorporate the same herein as if set forth at length.

151.    The Defendants' prolonged delays and other efforts designed to hinder Plaintiffs' in their ability to present the Site Plan Application constituted a violation of the

Plaintiffs' procedurals right to due process.

**WHEREFORE,** Plaintiffs seek judgment against Defendants Ocean

Township, Mayor and Council of Ocean Township and the Ocean Township Planning

Board as follows:

  a.   enjoining the Defendants in the future from delaying Plaintiffs' site
       plan application;

  b.   awarding Plaintiffs their damages for losses incurred as result of
       Defendants' violation of Plaintiffs' due process rights;

  c.   awarding Plaintiffs their reasonable attorneys' fees and costs of
       suit pursuant to 42 U.S.C. § 1988; and

  d.   granting Plaintiffs such additional relief as the Court may deem
       equitable and just.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues herein so triable.

## TRIAL COUNSEL DESIGNATION

Plaintiffs hereby designate Kenneth E. Pringle, Esquire, as Trial Counsel.

**PRINGLE QUINN ANZANO, P.C.**
Attorneys for Plaintiffs

By:   _____
      Kenneth E. Pringle, Esquire

Dated: July 11, 2005

47